## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF WEST VIRGINIA
## CLARKSBURG

**CORA JANE SPRINGER,**

Plaintiff**,**

v.

**NANCY A. BERRYHILL,**
**Acting Commissioner of Social Security,**

Defendant.

**CIVIL ACTION NO.: 1:16-CV-150**
**(JUDGE KEELEY)**

## REPORT AND RECOMMENDATION

## I.   INTRODUCTION

On July 6, 2016, Plaintiff Cora Jane Springer ("Plaintiff"), by counsel Travis M. Miller, Esq., filed a Complaint in this Court to obtain judicial review of the final decision of Defendant Nancy A. Berryhill,[1] Acting Commissioner of Social Security ("Commissioner" or "Defendant"), pursuant to Section 205(g) of the Social Security Act, as amended, 42 U.S.C. § 405(g). (Compl., ECF No. 1).   On September 8, 2016, the Commissioner, by counsel Helen Campbell Altmeyer, Assistant United States Attorney, filed an answer and the administrative record of the proceedings.   ECF Nos. 6 and 7. On October 7, 2016, and October 24, 2016, Plaintiff and the Commissioner filed their respective Motions for Summary Judgment. Pl.'s Mot. for Summ. J. ("Pl.'s Mot."), ECF No. 9; Def.'s Mot. for Summ. J. ("Def.'s Mot."), ECF No. 11. Following review of the motions by the parties and the administrative record, the undersigned Magistrate Judge now issues this Report and Recommendation to the District Judge.

---

[1] After this suit was filed, but before this Report and Recommendation was entered, Nancy A. Berryhill replaced Carolyn W. Colvin as the Acting Commissioner of Social Security. Accordingly, pursuant to Rule 25(d), Fed. R. Civ. P., and 42 U.S.C. § 405(g), Nancy A. Berryhill is substituted for Carolyn W. Colvin.

## II.   <u>PROCEDURAL HISTORY</u>

On November 27, 2012, Plaintiff protectively filed her first application under Title II of the Social Security Act for a period of disability and disability insurance benefits ("DIB") and under Title XVI of the Social Security Act for Supplemental Security Income ("SSI"), alleging disability that began on December 20, 2011. (R. 3).  Plaintiff's earnings record shows that she acquired sufficient quarters of coverage to remain insured through December 31, 2016; therefore, Plaintiff must establish disability on or before this date. (R. 227).  This claim was initially denied on April 9, 2013 (R. 103) and denied again upon reconsideration on June 7, 2013 (R. 161).  On June 11, 2013, Plaintiff filed a written request for a hearing (R. 167), which was held before United States Administrative Law Judge ("ALJ") Nikki Hall on December 17, 2014 in Clarksburg, West Virginia. (R. 28).  Plaintiff, represented by counsel Travis M. Miller, Esq., appeared and testified, as did Larry Bell, an impartial vocational expert. Id. On January 2, 2015, the ALJ issued an unfavorable decision to Plaintiff, finding that she was not disabled within the meaning of the Social Security Act. (R. 91). On May 17, 2016, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner. (R. 1).

## III.   <u>BACKGROUND</u>

### A.   Personal History

Plaintiff was born on May 16, 1959, and was 52 years old at the time she filed her first SSI claim. (R. 3). She completed the sixth grade (R. 19). Plaintiff's prior work experience included cleaning generally, (R. 22), which Plaintiff describes as a "'composite job' comprising duties of an industrial cleaner and laborer." (ECF No. 10 at 2). She was single at the time she filed her initial claim (R. 3) and was single at the time of the administrative hearing. (R. 28). She

has one dependent grandchild. (R. 368). Plaintiff alleges disability based on rapid heart rate, back problems, learning disabilities, anxiety, and depression. (R. 95).

**B.      Relevant History**

"The issue on appeal in this case is a very narrow one." (ECF No. 10 at 2). "While she does not agree with the medical findings, Ms. Springer is not contesting the medical findings in this decision for the purpose of this appeal." Id. Rather, Plaintiff challenges the ALJ's 1) "characterization of [her] past relevant work, 2) "failure to resolve inconsistencies between the [VE's] opinion and the Dictionary of Occupational Titles ("DOT")", and 3) "improper reliance on VE testimony that conflicted with Administration policy." Id. Accordingly, a recitation of history is limited to that which is relevant to these issues.

**C.      Testimonial Evidence**

At the ALJ hearing held on December 17, 2014, Plaintiff's counsel gave an opening statement. (R. 33). Counsel first noted that "the state agency indicated Ms. Springer is limited to light work." (R. 33-34). He then observed that "there has been an age change in this case," as Plaintiff "turned . . . 55 on May 16, 2014, [making] her 54 and a half on November 16, 2013." (R. 34). Accordingly, "with a nonmechanical application of the grid rules, [Plaintiff asserted that], given her unskilled past work," "obviously advanced age, education limited or less," "she would meet the grid rule 202.01." Id.  Counsel further asserted that "a nonmechanical application would be appropriate in this case, especially [] given [Plaintiff's] very, very poor intellectual ability." Id. In particular, Counsel addressed the issue of Plaintiff's literacy:

> ATTY  Along the grid rules, I would like to direct your attention to 202.09. 202.09 is one that I don't reference very often, but Your Honor, it deals with the closely approaching advanced age category, unskilled or no past relevant work, but it requires a finding of illiteracy.
> ALJ     Right.
> ATTY  Your Honor, illiteracy is addressed in the regulations at 404.1565 section (A) (1).

3

That is the best definition that I can find that the Administration has, and it's quite a vague definition. It talks about the inability to read and write. Well, as you can see in 4F, Ms. Springer's ability to read and spell are extremely low.

ALJ   Right.

ATTY  We're talking about second grade level at best. It talks about the inability to write simple messages, such as instructions or inventory lists. Again, Your Honor, we're talking about here only, let me look specifically here, reading third grade with her ability to spell, which would be her ability to write, is only at the 2.1 grade level.

ALJ   Right.

ATTY  So, Your Honor, we would argue to you that under this definition that the Administration has and the examples that they give that she would meet the definition of illiteracy, because I don't think there's any way that she's going to write an inventory list with a 2.1 grade level writing ability. So, Your Honor, that's 202.09.

(R. 36).

Plaintiff testified that her marital status was single. (R. 42). She lives with one dependent grandson, who was eleven years old at the time of the hearing. Id. She has a driver's license; the extent of her driving is typically to pick up her grandson from school. Id. Her daughter drove her to the hearing, which was a twenty-minute drive from her home. (R. 43-44).

Plaintiff testified that she completed the sixth grade, and dropped out in the seventh grade when she got married. (R. 44). When asked if she had any special education classes, Plaintiff testified that she "had a few maybe where they took me out and tried to help me with reading and speech." Id. The ALJ questioned Plaintiff about her ability to read, write, and do math:

Q      Can you read?
A      Easy -- few, easy words.
Q      So, like if you're going to the store, can you read the labels on the food cans or the boxes?
A      Well, if it's not hard. No. Some of them words, big words, forget it.
Q      And not the ingredients. I can't read those.
A      No.
Q      But you know if it said Stovetop Stuffing, would you be able to --
A      Yes. Something like that. Or you can by pictures I know what that is.
Q      Do you read anything else? Do you read anything for pleasure? Like magazines or
A      Not really. Just aggravate me, because of –
Q      How about writing?
A      No. That's worse yet.
Q      Can you sign your name?
A      Yes.
Q      Can you write a check or a money order?
A      Yes. But if I need help with that, I can get somebody to help me with it.

| | |
|---|---|
| Q | So, when you're writing out a check or a money order, you get somebody to help you? |
| A | If I need help, yes. I've got -- my sisters help me. |
| Q | Have you ever had a checking account? |
| A | Yes. When I was married. |
| Q | Was it a joint account with your husband? |
| A | Yes. |
| Q | Since you've been separated, have you had your own checking account? |
| A | I've got a checking account, but I've got a debit card, and I use that. |
| Q | What about going to the store? Can you go into the store and buy whatever you need to buy and give the cashier the money and get your change back? |
| A | Yes. And -- or use my debit card. |
| Q | Can you count change? |
| A | I get food stamps. |
| Q | So, it's like a SNAP card? |
| A | Yes. |
| Q | But can you count change? Like if you gave somebody a dollar for something that cost 50 cents, do you know that they're going to give you back 50 cents? |
| A | Yes. |
| Q | Can you do like very simple math? Two plus two? |
| A | Yes. Things like that, but if it gets -- my times and stuff are -- |
| Q | So, you can add. Simple math. |
| A | Simple things. Yes. But not real -- |
| Q | Have you ever taken any kind of vocational training? |
| A | No. I went before to you know where they took -- tried to help reading, but it didn't -- |
| Q | It didn't help? |
| A | No. |

(R. 44-46).

The ALJ next questioned Plaintiff as to her financial situation. (R. 47). Plaintiff testified that she was receiving unemployment, but that ended in 2012. (R. 48). Currently, she receives food stamps, and she gets fifty (50) dollars per month in child support for her grandson. (R. 47). She had previously applied for worker's compensation, "for [her] hearing, from all that loud noise at [her prior job at Aurora]," but was denied. (R. 49). She had a 401k previously, but currently has no other income of any kind. Id. Because she has only food stamps and fifty dollars in child support monthly, Plaintiff relies on her family for help. (R. 50) ("my sisters will help me, and my daughter or my son").

5

The ALJ next questioned Plaintiff about her work experience. Plaintiff testified that she worked at Job Squad, a subcontractor, in August of 2004 until May of 2005. (R. 51). Plaintiff testified that Job Squad was an organization for "people with handicap[s]," and that there were people on site from Job Squad who would direct her in performance of her duties. (R. 58)

With Job Squad, she cleaned the bathroom, vacuumed, took out the trash, carried cases of soda and water up the steps, (R. 51), replaced five gallon jugs of water, dusted, swept, and mopped. (R. 52). She did not have to move any furniture. Id. In May of 2005, Plaintiff was hired directly by Aurora to do the same job she had been doing as a contract employee through Job Squad (R. 53). Plaintiff testified that the only additional duties she had with Aurora was that she would paint walls, and sometimes "go and pick up the pop and water and stuff like that." (R. 54). Upon questioning by the ALJ, Plaintiff clarified that she had not done this when employed by Job Squad, but started doing it some time after she began working for Aurora. Id. Plaintiff worked for Aurora until she was fired, she testified, "because of [the] pains in [her] chest and [her] anxiety and [] depression." (R. 55). She was fired after having been "in the hospital a few times about [her] chest." Id.

The VE questioned Plaintiff about the weight she lifted at those jobs. Plaintiff testified that she lifted multiple cases of soda at a time, and 55-gallon bags of trash that were "pretty heavy," though she could not estimate a weight for those. (R. 56). Both the ALJ and Plaintiff's attorney questioned her further as to lifting:

Q      That's okay. At one point when you were completing some forms after your application, you were indicating that you had to lift some boxes of cleaning supplies and things like that.
A      Yes. I forgot that, ma'am.
EXAMINATION BY THE ADMINISTRATIVE LAW JUDGE:
Q      That's okay. So, how heavy do you think those were?
A      I don't know. I really don't know.
Q      Okay.

6

A      I don't remember. I'm sorry.

Q      That's all right.

EXAMINATION BY THE ATTORNEY:

Q      Do you think they were over 20 pounds?

A      Yes. Be over 20 pounds. Some of them's pretty heavy, but I can't remember how much.

(R. 58). Plaintiff was questioned about her impairments:

Q      Can you tell me in your own words what prevents you from working?

A      Well, right now I have like I said about my learning. It is very hard to go out in the world to get a job with my learning, and my depression it makes it hard because I never know when I'm going to have a breakdown. And I have a lot of trouble with my back. I do. Stand on stand too long and then my spine back -- all the way back up to my neck, all the way down in here will hurt. If I sit --

Q      So, from basically the top of your neck to the very lower part of your back?

A      Yes, ma'am. Will hurt, and like sitting like this will -- it's bothering me right now.

(R. 57). Plaintiff's attorney questioned her further about things she needs assistance with:

Q      How did you get that driver's license?

A      Well, I took the test maybe twice, and I failed it, and then give it to me orally.

Q      Somebody read it to you?

A      Yes.

Q      Did you have any trouble with that?

A      Yes. He would kind of explain it to me a little bit, and I would -- then I would understand it a little better, and then I could give him the answer.

Q      Do you get letters from Social Security sometimes?

A      Yes.

Q      Do you have any trouble with those?

A      Yes.

Q      What kind of trouble do you have?

A      Well, I don't really understand what it -- I can read some, but not enough to understand what it really means.

Q      When you get one of those letters, what do you do?

A      Well, if I want to know what it really -- understand it, I would have to take it to somebody else to read it to me.

Q      Do you call me and ask me about them?

A      Yes, I called you.

Q      Sure. Okay. Paying bills. Do any of your family members help you with that?

A      Yes, sir.

Q      You were talking with the Judge about using your debit card. Do you get cash from your debit card?

A      Yes.

Q      So, when you have to pay a bill, do you take the cash and pay the bill?

A      Yes. I get cash out of it. Take it and pay bills or -

Q       So, how do you keep track of how much money is in the account?

A       Well, normally what I'll do I'll get the receipt out and see what the receipt says. Then I know how much I've got in there, and I know not to go overboard. Overboard or whatever.

Q       The amount that it shows?

A       Yes.

Q       Now, the Judge was asking you some questions about making change. When you go to a store and you pay with cash, do you check the change there at the register?

A       No.

Q       If you were going to try to do that, would you have any trouble?

A       It all depends on what amount it is. If it's something easy, it's all right. But --

Q       What if it was something like $7.37 was what you charged and you gave them a $10? Would you try to count that out at the register?

A       If I gave them a $10?

Q       Yes.

A       And the change? If they gave me change back?

Q       Would you try to count that while you were standing there in line at the register?

A       Try to figure out what it was?

Q       Yes, ma'am.

A       No. I'd just let them give me the change, and I'll go.

(R. 59-61).

Q       You obviously, I think it's pretty clear in your record, you went through a difficult situation with your ex-husband.

A       Yes.

Q       You had been married how long?

A       36 years.

Q       What kind of things did he take care of when you were married?

A       Well, he took care -- he worked and took care of everything, and I really didn't really have to -- you know I took care of my children and took care of you know the house and stuff.

Q       Did he take care of paperwork?

A       Yes.

Q       What about the checking? The bank account?

A       Yes.

Q       Taxes? Now, you told me a story that I think you were wanting to tell the Judge. You all went to buy a house one time.

A       Yes.

Q       What kind of experience did you have trying to fill out those forms?

A       Yes. I had to -- it was a septic system in our house, and I had to write saying that I knew it was there, and I had to write it down on paper. And I had to try to write it out myself, and I couldn't spell the words.

Q       Ms. Springer, let me maybe try to cut this a little bit short. You had to do that in front of people, was that right?

A       Yes.

Q And was that embarrassing for you? That's a yes? Okay. You went through that difficult divorce with your husband. Did you depend on him a lot?

A Yes . . . I mean you've been married to him that many years and everything. I got married to him when I was 14 years old. He was only -- the only thing I knew. Being a child and marrying him. He was 25 when I married him. And I had my first child when I was 15. And no education. So, then that's one thing he told me when he left me is about my read -- you know I was doing something. He said, who's going to help you now.

(R. 62-63).

ALJ:

Q Do you do your grocery shopping?

A Yes, ma'am.

Q How do you remember what you need to get at the store?

A I just go and pick out what I want.

Q You don't make a list?

A No. I can't write a list. Can't write a letter.

(R. 69). Plaintiff's counsel next called Ms. Springer's daughter, Tammy Channel, to testify.

Q Ms. Channel, I just want to kind of get right to the point here. I want to ask you some questions about her intellectual functioning, reading, writing, that sort of thing. When you were a child, was she able to help you with your school work?

A No. She did attempt to, but her limitations -- she didn't it -- when I would come to her for help, it frustrated her. She tried to, to the best of her ability, but it frustrated her too much. Even when she would -- I'd come to her as a child for bedtime stories, when she tried to read to me, she'd just -- she struggled so much that I didn't understand it. So, I just kept trying and trying and trying to get her to try to read to me. You know, Mommy, read this story to me. Mommy, read this story to me. And then she would just shut down, and she wouldn't do it. And I didn't understand why, and then she just pushed me away, and she wouldn't do it. I was a natural reader, and you know she told me that she'd prayed you know that I wouldn't pick up on her learning disabilities, which you know thank God I didn't, but she couldn't help me. She couldn't help me with my reading early on. She couldn't help me to -- now when it came to spelling, I would -- she would look at a word, and she could tell me if I had each letter correctly, but she couldn't tell me the word, but she could tell me like if I got number one correct with each word, but she couldn't tell me what the word was. But she could tell me if I had B right or E right or T right or like if I spelled better, she could tell me that the letters were correct, but she couldn't tell me it was better.

Q Right. I understand that. She knows what the alphabet letters look like, but she couldn't --

A She couldn't

Q -- put them together to make a word.

A Exactly.

EXAMINATION BY THE ATTORNEY :
Q     So, is she pretty self-conscious about this?
A     She's very self-conscious. It --
Q     She gets embarrassed?
A     She's very embarrassed. That fell back to grade school. She was made fun of a lot because of her disability. The teachers actually put her in the back of the class, which pointed her out in front of the other kids. That they labeled her as stupid.
Q     Let's stick to more of the time that you were actually personally familiar with.
A     Sure.
Q     Just tell me what deficits do you see her having just on a daily basis that would relate to reading, writing, math, anything like that.
A     Well, I can tell you that anything that she has to have filled out, she comes to me to fill it out for her. Any applications. Like with this whole thing --
Q     Sure.
A     - - I filled it out.
Q     What about does she handle money very well?
A     Yes. She can pay her bills on a day-to-day basis. If she has to do like the adding, subtracting and stuff like that, she can struggle a little bit, but with a little bit of help she's okay. Her main thing is reading, comprehension, that type of thing. She cannot do it at all. She can't do any kind of lengthy spelling. She knows her alphabet, but she can't do anything above that.
Q     When she got divorced, did she understand the money issue and did she even ask for any money in the divorce?
A     No. We tried. We tried. It's like she didn't comprehend anything above what was going on. We tried to get her to go in to get anything for herself, and she refused. Now, a couple years later, she was like, why didn't I? Why didn't you guys make me? We said, we did. We tried, Mom. I said, I couldn't physically force you to do it.
EXAMINATION BY THE ADMINISTRATIVE LAW JUDGE:
Q     Right.
A     And she's like, I'm so stupid. I'm so this. I said, Mother, don't put yourself down like that. You know I said, you were in a situation that you've never been in before, and you didn't know how to handle it.
Q     Right.
EXAMINATION BY THE ATTORNEY :
Q     I know that she takes care of her grandson.
A     Yes.
Q     Devan?
A     Yes.
Q     Does she have any help from family members caring for Devan?
A     Yes. Right across the street from where she lives, my uncle, her brother, and two houses down is her other brother lives. My uncle. So, it's kind -- they all -- we all chip -- we all -- I don't live in the county any longer, but they all chip in together and kind of help together. And also his dad, my brother, comes over often.

(R. 73-77).

D.     **Vocational Evidence**

Also testifying at the hearing was Larry Bell a vocational expert.  Mr. Bell characterized

Plaintiff's past work at Job Squad as a "cleaner," 323.687-014, which was light work, unskilled,

with a specific vocational preparation (SVP) of two (2). (R. 81). Mr. Bell classified Plaintiff's

work with Aurora as the same, "with the exception that infrequently it sounds like she went into

the medium range." (R. 82).

With regards to Plaintiff's ability to return to her prior work, Mr. Bell gave the following

responses to the ALJ's hypothetical:

> Q     Mr. Bell, let's assume a hypothetical individual the same age, education and work
> background as the claimant who is capable of performing a full range of light
> work, as defined in the regulations, except that this individual will be limited to
> occasional climbing ramps and stairs, balancing, stooping, kneeling, crouching
> and crawling.
> She should never climb ladders, ropes or scaffolds. There would be no visual or
> communication limitations. However, this individual should not be subject to
> more than occasional exposure to concentrated levels of extreme cold, vibration
> or hazards, such as moving mechanical parts or unprotected heights.
> And lastly, the work should be limited to simple, routine tasks. Would such a
> person be able to perform the claimant's past work either as she actually
> performed the work or as the occupation is generally performed in the national
> economy?
> A     The work that she did at Job Squad at light would be - would remain, Your Honor.
> Q     Okay. Can she perform any other work, and if so, could you give me a few    ..
> examples, with the numbers for each occupation?
> A     Yes, Your Honor. That hypothetical individual at the light level I believe could
> function as a laundry folder . . . light and unskilled, SVP two . . . 49,500
> nationally . . . 725 regionally. 369.687-018 . . .
> A     A garment sorter and marker. Light, unskilled, SVP two . . . 87,000 nationally.
> 1,000 regionally. 222.687-014.

(R. 83-84). Incorporating the above hypothetical, the ALJ then questioned Mr. Bell regarding

Plaintiff's ability ability to work if she is completely credible as to the severity of her condition:

> Q     Let's assume a hypothetical individual with the same facts and circumstances as
> the previous hypothetical. However, this hypothetical individual has the ability to
> understand, remember and carry out simple routine tasks, dealing with objects
> rather than people.

The work should be performed at a low stress setting, which is defined as requiring no assembly line, no fast paced production requirements, no more than occasional changes in work routine or work setting, and which requires only occasional simple decision making.

The work will be essentially isolated, with only occasional contact with supervisors, coworkers or the general public. Would such a person be able to perform the claimant's past work, either as she actually performed the work or as it's generally performed in the national economy?

A      As she performed it in -- performed, I believe that would still allow for that job, Your Honor.

Q      For the Job Squad?

A      Yes.

Q      And would the other work change from the first hypothetical? Would you have the same two jobs? . . .

A      Those jobs would be available.

Q      . . . Has your testimony today been consistent with the DOT?

A      Yes, Your Honor, I believe it is.

(R. 85-86).  Plaintiff's attorney questioned Mr. Bell when provided the opportunity:

Q      Now, Mr. Bell, in regard to her job at Aurora, the record indicates that she did things in addition to cleaning, like painting, setting up tables for events, carrying food and beverages for events and working in the landscaping. Are those activities normally part of the job of cleaner that you mentioned earlier?

A      No. That's why I put it up into the medium range. It's a combination job. It is -- for example, if she did landscaping only, that would be at the medium level. So, it seems to be a combination job. That's why I put it up into the medium range.

Q      Okay. That's exactly what my next question was going to be. Is there any one DOT title that covers all of those work activities?

A      A combination job.

Q      Okay. So, the activities that she did at Aurora would actually be covered by more than one DOT code?

A      Correct.

Q      Some of those DOT codes would be at the light level and some of them would be at the medium level?

A      Correct. It'd be all unskilled.

(R. 88-89).

## E.      Objections to VE Testimony

On December 19, 2014, two (2) days after the hearing, Plaintiff's counsel faxed

written objections to the VE's testimony to ALJ Hall, outlining the disputed portions of the VE's

testimony and the reasons for dispute. (R. 293). Plaintiff objected to:

1.    The VE's classification of Plaintiff's past work as

    a.  "Cleaner, Housekeeping," DOT job code 323.687-014, because Plaintiff's past work was dissimilar; in fact, it was much more akin to both 381.687 – Cleaner, Commercial or Institutional, or 381.687-018 – Cleaner, Industrial;

    b.  Light work, because as she testified and listed on her work history forms, she frequently lifted at least 25 pounds;

    c.  Competitive work, because Job Squad is an organization who employs "*only* individuals with documented disabilities;"

2.    The VE's testimony that a hypothetical individual could return to Plaintiff's prior job, because even the job he incorrectly classified Plaintiff's work as requires the ability to read, and Plaintiff is basically illiterate;

3.    The VE's improper classification of Plaintiff's past "composite job" by the lighter duties as opposed to her heavier duties, in violation of Administration policy; and, a result of all of these,

4.    The ALJ's failure to resolve this conflict between the VE testimony and the DOT.

(R. 293-296). Plaintiff further argued, in relevant part, that a correct application of the grid rules would mandate a finding of disabled. (R. 296).

## F.    Work History Reports

On an undated work history report form, Plaintiff reported that she had worked "cleaning" at a "cleaning service" [Job Squad] in 2004, and "maintenance" at a "plane parts factory" [Aurora] from 2005 – 2011. (R. 238). All remaining items were left blank on the form,

except her hours and rates of pay. At her first cleaning job, she worked eight (8) hours per day, five (5) days per week, at a rate of $7.00 per hour. (R. 239). At her second job, she worked eight (8) hours per day, five days per week, at a rate of $13.40 per hour. (R. 240).

Plaintiff's counsel helped her complete a second work history report form dated June 6, 2013. (R. 264-271). Here, Plaintiff elaborated that at Aurora, she "cleaned, painted, buffed floors, helped set tables for events, carried food and beverages for events and pulled weeds from landscaping." (R. 265). She used machines, tools, or equipment. Id. In an eight (8) hour workday, she walked and stood for eight (8) hours; reached for six to seven (6-7) hours; handled, grabbed, or grasped big objects for five (5) hours; climbed for zero to four (0-4) hours; crawled for one (1) hour; stooped, kneeled, and crouched for two (2) hours; and wrote, typed, or handled small objects for two (2) hours. Id. She lifted up to fifty (50) pounds, and frequently lifted twenty-five (25) pounds. Id. She did not supervise other workers and was not a lead worker. Id.

With Job Squad, Plaintiff "cleaned the same airplane parts factory," and her job duties included sweeping, mopping, and general cleaning. (R. 266). She used machines, tools, or equipment. Id. In an eight (8) hour workday, she walked and stood for eight (8) hours; reached, kneeled, stooped, and crouched for four (4) hours; handled, grabbed, or grasped big objects for three (3) hours; and handled small objects for four to five (4-5) hours. Id. She did not climb, crawl, write, or type in this job. Id. She lifted up to fifty (50) pounds, and frequently lifted twenty-five (25) pounds. Id. She did not supervise other workers and was not a lead worker. Id.

### G. Additional Evidence

On December 16, 2014, Alice Wright, Plaintiff's cousin, wrote a letter to the ALJ recounting her experiences and observations regarding Plaintiff. (R. 291). Alice has known Plaintiff her "whole life" and attended school with her. Id. Although Cora started school two

grades ahead of Alice, by second grade, they were in the same class because Cora kept getting held back. Cora "really struggled with her grades and classwork, [and] could hardly read or write at all; she was not any better at math." Id. Alice stated that the "school just kept passing her on after the second grade because they could not keep an older kid in second grade any longer." Id.

At age fourteen, Cora's parents allowed a man over ten years her senior to marry her because he "promised he would take care of her." Id. Alice stated that Cora was "married in February and was pregnant by March. She was only 14 years old! She had no idea what was happening." Id. They were married until recently when Cora's husband left her after having an affair with her married cousin, which greatly affected Cora. Id. During their marriage,

> Cora was mostly a stay at home mom for her two kids. Her husband took care of everything else. He handled all the paperwork and bills. Cora could never do those things. She does not read well at all. Even when she tries to read something she does not understand what she can read. She cannot handle a checkbook. She will not have anything to do with a computer. She just does not seem to understand many adult situations. For example when she got divorced she did not understand what was going on. She did not understand the financial consequences of what was happening. it was like she did not realize she would need money once he was gone. She did not ask for any alimony at all.

> It was one thing to lose a husband of all those years but she was so dependent on him. She has no confidence in herself. She tries to hide the fact that she cannot read and write. It is very embarrassing for her. I have seen her just sit in a corner. She is so nervous about anything out of the ordinary or new. She gets scared when she is in public around strangers. Honestly if it weren't for her grandson I would worry about what she would do to herself.

Id. Although it is "very hard on her," Cora's grandson stays with her and she "does the best she can," with the help of family members who live nearby.

## IV.   THE FIVE-STEP EVALUATION PROCESS

To be disabled under the Social Security Act, a claimant must meet the following criteria:

> An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work

experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work…'[W]ork which exists in the national economy' means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.

42 U.S.C. § 423(d)(2)(A) (2006). The Social Security Administration uses the following five-step sequential evaluation process to determine if a claimant is disabled:

(i) At the first step, we consider your work activity, if any. If you are doing substantial gainful activity, we will find that you are not disabled.

(ii) At the second step, we consider the medical severity of your impairment(s). If you do not have a severe medically determinable physical or mental impairment that meets the duration requirement . . . or a combination of impairments that is severe and meets the duration requirement, we will find that you are not disabled.

(iii) At the third step, we also consider the medical severity of your impairments(s). If you have an impairment(s) that meets or equals one of our listings . . . and meets the duration requirement, we will find that you are disabled.

[Before the fourth step, the residual functioning capacity of the claimant is evaluated based "on all the relevant medical and other evidence in your case record . . ." 20 C.F.R. §§ 404.1520; 416.920 (2011).]

(iv) At the fourth step, we consider our assessment of your residual functional capacity and your past relevant work. If you can still do your past relevant work, we will find that you are not disabled.

(v) At the fifth and last step, we consider our assessment of your residual functional capacity and your age, education, and work experience to see if you can make an adjustment to other work. If you can make an adjustment to other work, we will find that you are not disabled. If you cannot make an adjustment to other work, we will find that you are disabled.

20 C.F.R. §§ 404.1520; 416.920 (2011). If the claimant is determined to be disabled or not disabled at one of the five steps, the process does not proceed to the next step. Id.

## V.    ADMINISTRATIVE LAW JUDGE'S DECISION

Utilizing the five-step sequential evaluation process described above, the ALJ made the following findings:

1.     The claimant meets the insured status requirements of the Social Security Act through December 31, 2016.

2.     The claimant has not engaged in substantial gainful activity since December 20, 2011, the alleged onset date (20 CFR 404.1571 *et seq*., and 416.971 *et seq*.).

3.     The claimant has the following severe impairments: chronic cervical and dorsolumbar strain; degenerative disk [sic] disease of the lumbar spine; affective disorder, anxiety disorder, and borderline intellectual functioning (20 CFR 404.1520(c) and 415.920(c)).

4.     The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

**5.**     After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except that t**h**e claimant is limited to occasional climbing of ramps or stairs, balancing, stooping, kneeling, crouching and crawling; should never climb ladders, ropes or scaffolds; has no manipulative, visual or communicative limitations, but should not be subject to more than occasional exposure to concentrated levels of extreme cold, vibration, or hazards such as moving mechanical parts or unprotected heights; has the ability to understand, remember and carry out simple, routine tasks, dealing with objects rather than data or people; should work in a low stress setting, which is defined as requiring no assembly line work, no fast-paced production requirements, no more than occasional changes in work routine or work setting, and only occasional simple decision making; and should work essentially isolated, with only occasional contact with supervisors, co-workers or the general public.

6.     The claimant is capable of performing past relevant work as a cleaner. This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565 and 416.965).

7.     The claimant has not been under a disability, as defined in the Social Security Act, from December 20, 2011, through the date of this decision (20 CFR 404.1520(f) and 416.920(f)).

(R. 11-22).

# VI.     DISCUSSION

## A.     Standard of Review

In reviewing an administrative finding of no disability the scope of review is limited to determining whether "the findings of the Secretary are supported by substantial evidence and whether the correct law was applied." Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). Substantial evidence is "such relevant evidence as a reasonable mind might accept to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)). Elaborating on this definition, the Fourth Circuit has stated that substantial evidence "consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a jury verdict were the case before a jury, then there is 'substantial evidence.'" Shively v. Heckler, 739 F.2d 987, 989 (4th Cir. 1984) (quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1968)).

However, "it is not within the province of a reviewing court to determine the weight of the evidence, nor is it the court's function to substitute its judgment…if the decision is supported by substantial evidence." Hays, 907 F.2d at 1456 (citing Laws, 368 F.2d at 642; Snyder v. Ribicoff, 307 F.2d 518, 529 (4th Cir. 1962)). In reviewing the Commissioner's decision, the reviewing court must also consider whether the ALJ applied the proper standards of law: "[a] factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." Coffman v. Bowen, 829 F.2d 514, 517 (4th Cir. 1987).

## B.     Contention of the Parties

Plaintiff, in her Motion for Summary Judgment, asserts that the Commissioner's decision "is not supported by substantial evidence nor reached upon a correct application of the relevant law." (Pl.'s Mot. at 1; ECF No. 9). Specifically, Plaintiff alleges that the ALJ erred by:

1.   Improperly relying on an inaccurate characterization of Plaintiff's past relevant work; and

2.   Failing to resolve inconsistencies between the VE's opinion and the DOT; thus

3.   Incorrectly applying the Medical-Vocational Guidelines as a result, erroneously finding that Plaintiff could return to her past work of Housekeeping Cleaner.

(Pl.'s Br. in Supp. of Mot. for Summ. J. ("Pl.'s Br.") at 2, ECF No. 10). Plaintiff asks the Court to "remand[] her case to the Commissioner for a fair and proper hearing." (Id. at 13).

Defendant, in her Motion for Summary Judgment, argues that the ALJ's decision "is supported by substantial evidence and should be affirmed as a matter of law." (Def.'s Mot.; ECF No. 11). Specifically, Defendant alleges that:

1.   The ALJ permissibly relied on the VE's Classification of Plaintiff's past relevant work;

2.   Plaintiff conflates her duties under two different jobs;

3.   Plaintiff has not identified any conflicts between the VE's testimony and the DOT; and

4.   Plaintiff's past work at Job Squad was not a composite job, as Plaintiff contends.

(Def.'s Br. in Supp. Of Def.'s Mot. for Summ. J. ("Def.'s Br."), ECF No. 12).

### C.  Analysis of the Administrative Law Judge's Decision

At step four, the ALJ found that Plaintiff could perform her past relevant work ("PRW") as a "cleaner" with Job Squad. (R. 21). This is the only prior relevant work that the ALJ discussed finding that Plaintiff could perform. Though she did not explicitly so state, it appears the ALJ did not find that Plaintiff could return to her past work with Aurora. Accordingly, the undersigned considers only Plaintiff's work with Job Squad.

### 1.  ALJ's Reliance on VE's Testimony, Generally

Defendant argues that the "ALJ permissibly relied on [the VE's] testimony" in making her determination. (ECF No. 12 at 8). Defendant first argues that Plaintiff stipulated to the VE's qualifications to testify at the hearing. (ECF No. 12 at 10). However, the VE's qualifications were not in dispute at the hearing, and are not in dispute now. Rather, Plaintiff disputes the *accuracy* of the VE's testimony, and its consistency with the DOT as required by SSR 00-4p. A stipulation as to the VE's *qualifications* to testify does not preclude any challenge to the *substance* of the VE's testimony.

As to substance, it is true that VEs are *presumptively* "reliable sources of occupational information in the evaluation of disability claims" upon which ALJs regularly rely. SSR 00-4p. Defendant cites a case from the District of Colorado, Perotin v. Colvin, in arguing that "it would be inappropriate to substitute the lay opinion of plaintiff's counsel for the vocational expert's expertise." 110 F. Supp. 3d 1048, *1055-56 (D. Colo. 2015). In Perotin, notably, the court did not condone the ALJ's failure to "inquir[e] in more depth as to the specific demands of [the plaintiff's past relevant work before finding that he could perform jobs . . . as generally performed." Id. at *1055. Rather, the Perotin court merely determined that any error was harmless because 1) Perotin "continued to work at a bookkeeper after his alleged date of onset [and] continued to apply for bookkeeping jobs even as of the date of the administrative hearing, and 2) there was no "suggestion that [his] past relevant work was particularly unique among bookkeeping positions." Id. at 1055. That is not the case here, as Plaintiff has not worked in nearly six years, and her counsel provided numerous and detailed reasons why the "Cleaner, Housekeeping" job description is distinct from the work Plaintiff did. Perotin thus does not aid Defendant here.

Plaintiff disputes Defendant's suggestion that she wishes to substitute the lay opinion of her counsel for that of the VE, and Defendant's characterization that she "insists that her jobs should have been classified as DOT # 381.687-014 or DOT # 381.687-018:"

> Ms. Springer has done no such thing. Frankly, Ms. Springer does not know what the proper classification of her past job should be. She only knows the proper classification of her past job is not that of a housekeeper because she has *never worked in the housekeeping field.* She merely points to these jobs to show that cleaner job classifications do exist in the industrial field, which is the setting in which Ms. Springer worked. Furthermore, it is not her duty to properly classify her past work. It is the ALJ's duty. The Social Security Administration will "… determine whether you can do your past relevant work, given your residual functional capacity." 20 C.F.R. §404.1560(b)(2).

(ECF No. 13 at 4).

Whether a VE's testimony is reliable or consistent is not a foregone conclusion. Rather, SSR 00-4p imposes "an affirmative responsibility [on the ALJ] to ask about any possible conflict between that VE or VS evidence and information provided in the DOT." Here, the ALJ satisfied that much:

> Q        . . . Has your testimony today been consistent with the DOT?
> A        Yes, Your Honor, I believe it is.

(R. 86).

This determination is not meant to be a mere formality, however. Simply asking the VE if his testimony is consistent and receiving an affirmative answer will not satisfy the ALJ's obligation under SSR 00-4p. Pearson v. Colvin, 810 F.3d 204, *208-10 (4th Cir. 2015) ("[an ALJ has not fulfilled] this duty if he ignores an apparent conflict because the expert testified that no conflict existed."). In this Circuit and this District, an ALJ's acceptance of inaccurate VE testimony is reversible error. Id.; see also English v. Shalala, 10 F.3d 1080 (4th Cir. 1993), Barr v. Berryhill, 2017 WL 2803176, No. 2:16-CV-42 (N.D.W.Va., June 12, 2017), adopted 2017 WL 2803168, No. 2:16-CV-42 (N.D.W.Va., June 28, 2017).

### 2. ALJ's Duty to Resolve Conflicts

An ALJ "may not rely on evidence provided by a VE . . . if that evidence is based on underlying assumptions or definitions that are inconsistent with our regulatory policies or definitions." SSR 00-4p. If there is any reason to inquire further, the ALJ must do so, and must explain in her decision how the conflict was resolved:

> In particular, this ruling emphasizes that *before* relying on VE . . . evidence to support a disability determination or decision, [an ALJ] must:
> - Identify and obtain a reasonable explanation for any conflicts between occupational evidence provided by VEs . . . and information in the *Dictionary of Occupational Titles* (DOT), including its companion publication, the *Selected Characteristics of Occupations Defined in the Revised Dictionary of Occupational Titles* (SCO), . . . and
> - Explain in the determination or decision how any conflict that has been identified was resolved.

SSR 00-4p (emphasis on titles in original; other emphasis added). See also Pearson v. Colvin, 810 F.3d 204 (4ᵗʰ Cir. 2015)).

As Plaintiff correctly observes, this duty extends to situations even where the conflict is "apparent" – i.e., where the testimony only *might* conflict (ECF No. 10 at 9-10, citing Pearson. SSR 00-4p imposes this duty on the ALJ "irrespective of how the conflict was identified." "SSR 00-4p 'requires nothing of the claimant,' so [a plaintiff's] failure to raise the conflict at the hearing does not preclude a finding that an apparent conflict exists." Rholetter v. Colvin, 639 Fed.Appx. 935, *937-38 (4ᵗʰ Cir. 2016) (per curiam, citing Pearson, 810 F.3d 204, *210 (4ᵗʰ Cir. 2015)). Accordingly, the ALJ's duty is the same regardless of whether a conflict is or should have been apparent on its face, or whether it was brought to the ALJ's attention by the VE or a party.

Although a failure to conform to the requirements of SSR 00-4p is harmless error when there is no conflict, an ALJ's blind acceptance of VE testimony that is determined to be inaccurate is reversible error. English v. Shalala, 10 F.3d 1080 (4ᵗʰ Cir. 1993). Therefore, an ALJ

22

who takes the VE at his word that his testimony is reliable and consistent with the DOT, without independent consideration, does so at her peril. Barrl, 2017 WL 2803176.

In this case, the undersigned finds that this would not be harmless error, because the issue is outcome-determinative. That is, Plaintiff asserts that these misclassifications and inconsistencies, which the ALJ failed to resolve in accordance with SSR 00-4p, resulted in the ALJ erroneously finding at step 4 of the sequential analysis that Plaintiff could return to her past relevant work. (ECF No. 10 at 11). Further, Plaintiff asserts that had the ALJ properly resolved the inconsistencies between the VE's testimony and the DOT, and properly characterized Plaintiff's work, she would not have found that Plaintiff could return to her prior work at step 4. As a result of the step 4 error, the ALJ erroneously did not reach step 5, at which point Plaintiff contends the Medical-Vocational Guidelines would have directed a finding of disabled.

### 3.  Conflicts Between the VE's Testimony and the DOT

#### a.  ALJ's Classification of Plaintiff's PRW as "Cleaner," DOT 323.687-014

Plaintiff argues that the VE's testimony that her past relevant work was "Cleaner," DOT job code 323.687-014, was an incorrect classification of her prior work, and inconsistent with the DOT. (ECF No. 10 at 6-7).

Defendant cites Perotin, in which the court rejected an argument that the VE misclassified the plaintiff's job because the plaintiff's rationale "was not at all self-evident from the description of those jobs in the DOT." 110 F.Supp at *1056. Here, unlike in Perotin, Plaintiff's counsel has provided detailed objections to the ALJ as well as a detailed explanation of the discrepancies in the description that *are* self-evident. Plaintiff argues that a review of the DOT reveals that there are jobs that match Plaintiff's work more closely than 323.687-014, such as 381.687-014 ("Cleaner, Commercial or Institutional") and 381.687-018 ("Cleaner,

Industrial"). (ECF No. 10 at 7). Defendant further argues that there is no actual conflict between the job the VE identified and the work Plaintiff performed at Job Squad, for a multitude of reasons. (ECF No. 12 at 11).

In order to resolve the question of whether the ALJ met her duty under SSR 00-4p to explain how any conflicts were resolved in this case, the undersigned need not consider whether there were conflicts that *should* have been apparent. Conflicts were expressly brought to the ALJ's attention two days after the hearing by Plaintiff's counsel in a series of detailed, written objections, (R. 292-296), and so the ALJ was clearly put on notice as to the conflict – though it should have been apparent on its face, even if she had not:

> One need go no further than the VE's classification of Ms. Springer's cleaning job in an industrial manufacturing facility as a maid in a housekeeping setting to see there is a conflict between the VE's testimony and the DOT. The ALJ was made fully aware of this conflict in a post-hearing memorandum, but chose to ignore the problem. (R. 292-303). As such, SSR 00-4p requires this case be remanded because the ALJ failed to resolve a known conflict between the VE testimony and the DOT.

(ECF No. 13 at 6).

As noted, Defendant has not raised any argument that the ALJ was precluded from considering these objections, or that she should not have. Rather, Defendant concludes that there is no conflict. The fact that the Defendant was able to find reasons why (she believes) there is no conflict, however, is irrelevant to the inquiry. The responsibility to determine whether the VE's testimony was consistent with the DOT, regulatory policies, and definitions, and to provide reasons for that decision, rests with the ALJ alone. SSR 00-4p.

Here, the ALJ has provided only a one-sentence, unexplained decision on the issue of the VE's testimony and conflicts, stating that she "accepted the vocational expert's testimony as consistent with the Dictionary of Occupational Titles." (R. 22). Whether the ALJ "accepted" the VE's testimony without further consideration, or whether Plaintiff's objections were considered

and rejected, is impossible to determine for certain from that sentence, though it strongly suggests Plaintiff's objections were not considered. Even if she had, she failed to explain her rationale as required by SSR 00-4p. The role of the reviewing court is only to determine whether the ALJ's decision is supported by substantial evidence. Hays v. Sullivan, 807. F.2d 1453 (4th Cir. 1990). The undersigned certainly cannot determine whether the ALJ's reasons for so deciding were supported by substantial evidence when she provided none. Further, to the extent that the record is less than clear as to Plaintiff's exact job duties with Job Squad, versus those with Aurora – as *both* parties observe in their briefs – the court cannot and will not attempt to resolve those facts, as that is reserved for the ALJ. The undersigned further finds that this error was not harmless because, as Plaintiff notes, the issues raised have the potential to be outcome-determinative.

### b.  Classification as Composite Job Under POMS DI 25005.020(B)

Plaintiff argues that the ALJ improperly relied on the VE's testimony because her work with Job Squad was properly classified as a composite job. (ECF No. 10). "Composite Jobs" are jobs in which no single DOT job code would be accurate alone, but rather have elements of more than one DOT job code. SSR 82-61.

Defendant argues that the VE did not find that Plaintiff's work at Job Squad had significant elements or two or more occupations as defined in SSR 82-61, so it was proper not to find Plaintiff's work at Job Squad to be a composite job. Id. at 14. Defendant further argues that even if he had, the VE and ALJ found that Plaintiff could perform the work not *as she* performed it, but as it was *generally* performed – either of which would suffice. (ECF No. 12 at 14) (citing Proctor v. Astrue, 2011 WL 6330415 (W.D. Wash. Nov. 28, 2011) (rejecting a similar misclassification argument because the VE's finding that claimant could perform the job "as

normally performed," even if not as actually performed, sufficed as substantial evidence under SSR 82.61).

Plaintiff does not dispute this general rule; however, Plaintiff rebuts the underlying assumption. Unlike <u>Proctor,</u> in which there was no dispute as to the underlying classification of "Office Manager," here, because the VE improperly classified Plaintiff's past relevant work in the first instance, the exertional requirements for that work are also now in dispute. (ECF No. 13 at 3-4) ("Where the past work is properly classified, the VE is clearly free to provide the exertional requirements as the job I generally performed in the national economy . . . This is not the issue here"). The undersigned agrees. See <u>Barr</u>, 2017 WL 2803176.

### 4. ALJ's Determination That Plaintiff Can Perform 323.687-014

#### a. 323.687-014's Requirements and Plaintiff's Abilities

##### i. Ability To Interact With Others

Plaintiff further argues that not only was this classification incorrect, but even if it had been correct, Plaintiff could not have performed it for two reasons. First, the Housekeeping Cleaner job is inconsistent with the ALJ's RFC, which stated Plaintiff must work with "objects rather than data or people" and "should work essentially isolated, with only occasional contact with supervisors, co-workers, or the general public." (ECF No. 10 at 8; R. 17). Plaintiff points out that the DOT description for 323.687-014 states that this job requires "...render[ing] personal assistance to patrons," (R. 299), and that "hotel room cleaners do not work in isolation and are frequently exposed to hotel guests." (ECF No. 10 at 8). However, given the unresolved conflict as to whether this *is* the proper classification of Plaintiff's past work, it is unnecessary and premature to reach this question.

### ii.  Light Work

Defendant argues that Plaintiff's work with Job Squad was light work as performed, as evidenced by her testimony. (ECF No. 12 at 10). Second, Defendant argues it is not error if the VE and ALJ found that Plaintiff could perform work as it is generally performed, even if not as actually performed. Id. (citing Linger, 2016 WL 2766070 at *15).

In her response, Plaintiff points out that the Defendant's brief aptly illustrates the "difficulty in addressing [her] work." (ECF No. 13 at 2). Plaintiff argues that she plainly stated she was having difficulty remembering during her testimony on this point, and if there was conflicting testimony, it was the ALJ's responsibility to resolve it. Id. Further, Ms. Springer is a significantly limited individual, with working memory index of only 66 and a full scale IQ of 71, just one point higher than would be needed to meet listing 12.05(c) for intellectual disability. Id. "Thus, if there are conflicts in Ms. Springer's testimony, we must recall her IQ is one point from that of a mildly mentally retarded individual." Id.

Plaintiff points out that, despite what the Defendant argues *post-hoc*, the ALJ herself found that Plaintiff's duties at Job Squad "included sweeping, mopping, and other general cleaning," Ex. 7E/4; "She was required to carry mop buckets, garbage bags, and cleaning supplies." (ECF No. 13 at 3) (citing R. 21). In so stating, the ALJ cited Exhibit 7E/4, which also states that Plaintiff frequently lifted twenty-five pounds, and lifted up to fifty pounds. Id.

Problematically, the ALJ did not indicate how much weight she found Plaintiff to carry in performance of those duties, nor did she indicate whether she found the weights listed in Exhibit 7E to be credible or not. (R. 21). How much weight the ALJ found Plaintiff carried at Job Squad is thus unclear.

In any event, Defendant is correct that the ALJ could have permissibly found that Plaintiff could perform her past relevant work either as it was performed, or as it is generally performed. However, in order to do so, Plainitff's past relevant work must first be correctly identified and classified. Because that question is currently unresolved and must be determined on remand, the issue of Plaintiff's ability perform her past relevant work - in either fashion - is premature.

### iii.  Literacy

Plaintiff argues that 323.687-014 also requires the ability to "[r]ead at a rate of 95-120 words per minute" and [p]rint simple sentences containing subject, verb, and object, and series of numbers, names, and addresses." (ECF No 10 at 9). Plaintiff argues that she is functionally illiterate, able to read only at the third grade level, and write only at the second grade level. Id. (citing R. 370). Accordingly, Plaintiff asserts that even if Housekeeping Cleaner was an adequate classification of her job, she clearly cannot perform it.

Defendant argues that Plaintiff is not illiterate because, although she reads at a third grade level and writes at a second grade level, she nonetheless attended up to the sixth grade in school before dropping out, and that the ability to read at all – even at a very low level – is not illiteracy. Id. at 13. Whether Plaintiff is technically illiterate or not is not the primary issue, however. Rather, the issue is whether the VE's testimony – and ALJ's subsequent finding – that Plaintiff could perform the job of "Cleaner, Housekeeping," 323.687-014 is consistent with Plaintiff's reading ability. That is, the job description of "Cleaner" requires the ability to read at a rate of 95-120 words per minute. One does not have to be completely and totally illiterate in order to be unable to read at that rate.

28

The ALJ's decision did not discuss plaintiff's reading ability except in general terms. In evaluating 12.05(c), the ALJ noted that Plaintiff's WAIS-IV verbal comprehension score was 76. (R. 16). There is no elaboration as to what such a score actually entails in terms of a corresponding reading rate. Plaintiff's WRAT-4 scores indicate that as to "Word Reading," Plaintiff's standard score is a 64, and the grade equivalent is a 3.2, but there is no indication as to how many words per minute that equals. (R. 370). It also indicated that Plaintiff was diagnosed with Borderline Intellectual Functioning. Id. Undoubtedly, there must be some way of determining, perhaps from the WRAT-4 scores, how many words Plaintiff is capable of reading per minute. However, the undersigned was unable to locate that information in this record – not in Plaintiff's medical evidence, the ALJ's decision, or the parties' briefs.

## VII.   CONCLUSION

Ultimately, because of the ALJ's error in failing to resolve conflicts in the VE's testimony regarding Plaintiff's past relevant work in accordance with SSR 00-4p, the undersigned cannot find the AJL's determination of prior relevant work to be supported by substantial evidence. As a result, each subsequent finding that rests on that determination – including whether Plaintiff is able to perform her past relevant work physically or mentally – can likewise not be found to have substantial evidentiary support.

## VIII.   RECOMMENDATION

For the reasons herein stated, I cannot find that the Commissioner's decision denying the Plaintiff's application for Disability Insurance Benefits and Supplemental Security Income is supported by substantial evidence. Accordingly, I **RECOMMEND** that Plaintiff's Motion for Summary Judgment (ECF No. 9) be **GRANTED**, Defendant's Motion for Summary Judgment (ECF No. 11) be **DENIED**, and the decision of the Commissioner be **VACATED** and this case

be **REMANDED** to the Commissioner under sentence four of 42 U.S.C. § 405(g) to first resolve the conflicts raised by Plaintiff as to VE's classification of Plaintiff's prior work, explain what Plaintiff's proper job classification is and why in accordance with SSR 00-4p, and then recomplete the remainder of the analysis accordingly, consistent with the directives herein and the relevant policies and regulations.

Any party may, within fourteen (14) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objections are made, and the basis for such objections. A copy of such objections should also be submitted to the Honorable Irene M. Keeley, United States District Judge.   Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation. 28 U.S.C. § 636(b)(1); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984), cert. denied, 467 U.S. 1208 (1984); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); Thomas v. Arn, 474 U.S. 140 (1985).

The Court directs the Clerk to provide a copy of this Report and Recommendation to all counsel of record, as provided in the Administrative Procedures for Electronic Case Filing in the United States District Court for the Northern District of West Virginia.

Respectfully submitted on July 25 2017.

MICHAEL JOHN ALOI
UNITED STATES MAGISTRATE JUDGE